In re PROJECT 5 DRILLING PROGRAM–1980, an Oklahoma limited partnership, Debtor.

DEVON ENERGY CORPORATION, Plaintiff,

v.

UTICA NATIONAL BANK AND TRUST COMPANY, a national banking association, et al., Defendants.

Bankruptcy No. 82–00611.
Adv. No. 82–0114.

United States Bankruptcy Court, W.D. Oklahoma.

June 10, 1983.

Kenneth I. Jones, Jr., and James S. Matthews, Jr., Oklahoma City, Okl., for Project 5 Drilling Co. and LaTerre Drilling and Exploration, Inc.

Jerome Sepkowitz, Oklahoma City, Okl., for Project 5 Drilling Rig Program-1980.

John W. Swinford, Jr., Oklahoma City, Okl., for Utica National Bank and Trust Co. and Seattle First National Bank.

George Short, Oklahoma City, Okl., for LaTerre Drilling and Exploration, Inc.

## MEMORANDUM OPINION AND ORDER

ROBERT L. BERRY, Bankruptcy Judge.

### STATEMENT OF THE CASE

The question presented to the Court is whether or not monies paid into Court constitute a receivable of the Shallow Rig Syndication or a receivable of Project Five Drilling Company.

The parties to this cause will be referred to in the following manner: Devon Energy Corporation, a corporation ("Devon"), Project 5 Drilling Company, Inc., a corporation (the "Company"), Project 5 Drilling Rig Program-1980, a partnership (the "Shallow Rig Syndication"), Utica National Bank and Trust Company ("Utica") and Seattle First National Bank ("Seattle-First"; collectively referred to as the "Banks"), Security National Bank and Trust of Norman ("Security Bank") and LaTerre Drilling and Exploration, Inc. ("LaTerre").

The parties have stipulated to the following facts:

1. The Company is an Oklahoma corporation.

2. Ronald G. Miller has been President and Chairman of the Board of Directors of the Company from its inception to date.

3. On or about December 22, 1980 the Company entered into a certain written Drilling Bid Proposal and Daywork Drilling Contract-U.S. with Devon (the "Drilling Contract").

4. The rig described in the Drilling Contract is "Rig No. 10". Devon used Rig 10 to drill all wells under the Drilling Contract.

5. On the date of the Drilling Contract, Rig 10 was being built for the Shallow Rig Syndication.

6. When Rig 10 was completed in January, 1981, it was purchased by the Shallow Rig Syndication, and Rig 10 has been owned by the Shallow Rig Syndication to this date. Rig 10 was never owned by the Company.

7. There is owing by Devon the sum of $294,866.71 as monies due under the Drilling Contract, and Devon has deposited $294,866.71 with the Court for payment to the rightful recipient of such monies.

8. The Shallow Rig Syndication is a limited partnership formed under the laws of the State of Oklahoma.

9. The Shallow Rig Syndication was formed by the Company, as general part-

ner, and various other limited partners, on the 31st day of December, 1980, pursuant to a Private Placement Memorandum, including a Limited Partnership Agreement (the "Agreement").

10. The Shallow Rig Syndication was formed for the purpose of holding title to Rig 10 and another rig and contracting for the use of such rigs in drilling wells.

11. On December 31, 1980, the Drilling Contract was assigned by the Company to the Shallow Rig Syndication by a written Assignment (the "Assignment of Contract").

12. On the same date as the formation of the Shallow Rig Syndication, December 31, 1980, the Banks lent money to the Shallow Rig Syndication for purchase of Rig 10 and another rig. As part of the loan collateral documents the Company executed an assignment of the Drilling Contract to the Shallow Rig Syndication, and the Shallow Rig Syndication in turn granted to the Banks a security interest in all contract rights and accounts receivable of the Shallow Rig Syndication. The security interest was perfected by a financing statement filed December 30, 1980.

13. For a period from late January, 1981 until late January, 1982, Devon used Rig 10 under the Drilling Contract to drill various holes. Devon owes the sum of $294,866.71 for use of Rig 10 under the Drilling Contract.

14. Security Bank loaned money to the Company on January 2, 1982. As part of the loan, Security Bank took a Security Agreement from the Company. The Security Agreement covered the accounts receivable of the Company. Although the Company had already assigned the Drilling Contract to the Shallow Rig Syndication, the Security Agreement described the accounts receivable from the Drilling Contract. The security interest evidencing this Security Agreement was perfected by a financing statement filed August 22, 1979.

15. On March 22, 1982, counsel for Devon advised Security Bank and the Company that a dispute had arisen between Utica and Security Bank regarding conflicting security interests in accounts receivable under the Drilling Contract.

16. Later, on April 14, 1982, after Security Bank received notice of the Banks' claim to the Devon receivable, Security Bank required LaTerre to purchase the Company loan and take an assignment of its Security Agreement as a condition to Security Bank loaning other funds to LaTerre.

17. LaTerre is an Oklahoma corporation formed January 28, 1982. It was created for the purpose of being the parent of LaTerre Energy, Inc. and LaTerre Drilling Incorporated, but this purpose was not accomplished. From its inception to date, Ronald G. Miller has been a stockholder and Chairman of the Board of Directors of LaTerre. Ronald G. Miller became President of LaTerre on or about July 19, 1982.

18. On April 4, 1982, James H. Kitchens was Vice President, director and shareholder of the Company. On April 14, 1982 James H. Kitchens was Secretary/Treasurer, director and shareholder of LaTerre.

The parties submitted briefs and the matter was taken under advisement. The parties now request the Court to determine who is entitled to the contract receivables.

It is the contention of the Company, as assignor to Security Bank, and LaTerre, as assignee of Security Bank, that LaTerre has a superior right to the collateral. The Company and LaTerre base this contention on the theory of equitable estoppel. In support of this theory, the Court is cited to certain portions of the Limited Partnership Agreement, the relevant portions of which follow:

8.01 General Authority. The Partnership Manager shall have exclusive authority to manage the operations and affairs of the Partnership and to make all decisions regarding the business of the Partnership. Persons dealing with the Partnership are entitled to rely conclusively on the power and authority of the Partnership Manager as set forth in this Agreement. In no event shall any person dealing with the Partnership Manager or the Partnership Manager's representative

with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, or be obligated to inquire into the necessity or expedience of any act or action of the Partnership Manager or the Partnership Manager's representative: and every contract, agreement, deed, mortgage, security agreement, promissory note or other instrument or document executed by the Partnership Manager or the Partnership Manager's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every person relying thereon or claiming thereunder that ... 3(i) The Partnership Manager or the Partnership Manager's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for or on behalf of the Partnership.

8.02 General Powers of the Partnership Management. In addition to the powers now or hereafter granted to the general partner of a limited partnership under applicable law or which are granted to the Partnership Manager under the other provisions of this Agreement, and within the limitations of the purpose for which the Partnership has been formed, the Partnership Manager shall have full and exclusive power and authority to do all things deemed necessary or desirable by it in the conduct of the business of the Partnership, including but not limited to, whether similar or dissimilar, ...; the making of expenditure and the incurring of any obligation it deems necessary to implement the purposes of the partnership; subject only to any express limitations contained in this Agreement, the acquisition, disposition, exchange or hypothecation of any or all assets of the Partnership, ....

8.03 Borrowing Powers. Project 5 shall have the authority (without affecting the allocation of net income, net loss or gain on sale hereunder), to mortgage, pledge or otherwise encumber on any terms it sees fit an undivided interest in the assets of the Partnership equal to or less than its interest in net income of the Partnership to obtain funds for use by it for its own purposes, with all repayments thereof and interest. Project 5 shall have no authority to pledge Participant's interest in the Partnership to secure loans for Project 5's purposes. No lender shall be required to look to the application of proceeds of any loan pursuant to this Partnership Agreement. Any such lender shall be entitled to rely on the representations of Project 5 as to its authority to enter into any financing arrangement, mortgage, pledge or other encumbrance executed by it, including the interest entitled to be covered thereby, and shall be entitled to deal with Project 5 as if it were the sole party in interest therein, both legally and beneficially.

It is submitted that the subscription by the limited partners to the Shallow Rig Syndication, and the terms under which such act was done, clearly evidences acquiescence on the part of the limited partners in the apparent state of affairs which led Security National to take a security interest in the Drilling Contract.

### LAW

▉ Without the written consent or ratification of the specific act by all the limited partners, a general partner has no authority to utilize partnership property for other than the benefit of the partnership. 54 O.S.1981 § 150.

The argument of the Company and LaTerre is that, by the terms of the Partnership Agreement itself, the limited partners vested in the Company the authority to act on their behalf and to utilize the property of the Partnership.

▉ Without question, the Company was vested with the authority to conduct business and enter into transactions on behalf of the Partnership. That much may be gleaned from a reading of the hereinabove quoted sections of the Partnership Agreement. The Agreement, however, in no wise whatsoever contemplates permitting the

Company to utilize partnership assets to inure to its own benefit. In point of fact, under the section of the Agreement entitled 'Rights and Obligations of the Partnership Manager', Project 5 shall have no authority to pledge Participant's interests in the Partnership to secure loans for Project 5's purposes. The definitional section of the Agreement defines 'Participant's' as "[t]he purchaser or purchase of Interests in the Partnership, including Project 5 to the extent of its Partnership Subscription." When the Company treated the Drilling Contract as its own, it violated not only the agreement, but Oklahoma law as well. 54 O.S.1981 § 150.

It is argued that whether or not the Company was the actual owner of the contract rights is irrelevant insofar as the Partnership Agreement entitled a party to rely on the representations of the Company as to its authority to enter into financing arrangements; that it is only equitable to permit LaTerre to receive the contract rights in dispute herein and estop the Banks from receiving the same.

■ The most comprehensive definition of equitable estoppel is that it is the principle by which a party who knows or should know the truth is absolutely precluded both at law and in equity, from denying or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely on such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion was allowed. *Arizona ex rel. Gaines v. Copper Queen Consol. Min. Co.,* 233 U.S. 87, 34 S.Ct. 546, 58 L.Ed. 863 (1914). Furthermore, equitable estoppel is intended to subserve the ends of justice. *Stone v. Bank of Commerce,* 174 U.S. 412, 19 S.Ct. 747, 43 L.Ed. 1028 (1899).

In order to invoke the doctrine of equitable estoppel, several requirements must be met. First, there must be false representation or concealment of facts made with actual knowledge or constructive knowledge of its falsity. Second, the receiving party must have been without knowledge of the truth or the means of making such determination. Third, the statement must be made with the intent that it be acted upon. Last, the receiving party must have acted upon it to his detriment. *State ex rel. Western. State Hospital v. Stoner,* 614 P.2d 59 (Okl.1980). It has also been held that a person relying on estoppel must have exercised such reasonable diligence as circumstances require and he cannot invoke estoppel if he failed to avail himself of information reasonably at hand. *L.C. Jones Trucking Co. v. Cargill,* 282 P.2d 753 (Okl. 1955).

■ This Court is cognizant that equitable principles govern the exercise of bankruptcy jurisdiction. *See, Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). The Court further takes note that the frequently stated maxim that "he who comes into equity must come with clean hands" is an ancient and favorable precept of the equity court. *Manufacturers' Finance Co. v. McKey,* 294 U.S. 442, 55 S.Ct. 444, 79 L.Ed. 982 (1935); *Story v. Hefner,* 540 P.2d 562 (Okl.1975). The maxim means that equity will not in any manner aid a party whose conduct with relation to litigation matter has been unlawful, unconscionable, or inequitable. *Houston Oilers, Inc. v. Neely,* 361 F.2d 36 (10th Cir.1966), *cert. denied* 385 U.S. 840, 87 S.Ct. 92, 17 L.Ed.2d 74, *reh'g denied* 385 U.S. 942, 87 S.Ct. 285, 17 L.Ed.2d 224.

■ In view of the "clean hands" maxim, the Court is somewhat incredulous that the Company is now before us arguing the doctrine of equitable estoppel. In view of our finding that the actions of the Company in regards to the Drilling Contract breached its duty owing to the limited partners, as well as statutory law, the Company's position is untenable.

LaTerre is in a slightly different position. As assignee of Security Bank, LaTerre has no greater rights than Security Bank. *Na-*

*tional Bank of Commerce of Tulsa v. ABC Const. Co.*, 442 P.2d 269 (Okl.1966); 12 O.S. 1981 § 222. It is LaTerre's position that, as the doctrine would be applicable for Security Bank, it is applicable for LaTerre.

From a reading of the Stipulation of Facts, it can be seen that Security Bank assigned the Drilling Contract to LaTerre *after* Security Bank became aware that a dispute existed as to the proceeds of the Contract. Had Security Bank itself come into court and argued the doctrine of equitable estoppel, it would be questionable as to whether such actions bespeak "clean hands".

Assuming, *arguendo,* that Security Bank could meet the requirements of equitable estoppel, this Court is of the opinion that LaTerre still may not utilize the doctrine.

The Stipulation of Facts reveals that Ronald G. Miller has been President and Chairman of the Board of Directors of the Company from its inception to date. LaTerre was formed January 28, 1982. From its inception to date, Ronald G. Miller has been a stockholder and Chairman of the Board of Directors of LaTerre. Ronald G. Miller became President of LaTerre on or about July 19, 1982. On April 4, 1982, James H. Kitchens was Vice President, director and shareholder of the Company. On April 14, 1982, the date of Security Bank's assignment to LaTerre, James H. Kitchens was Secretary/Treasurer, director and shareholder of LaTerre.

There exists no question in the mind of this Court that at all pertinent times, these individuals had personal knowledge as to these various transactions. As a result of these machinations, an attempt has been made whereby the Company may, in essence, assign the Drilling Contract to an alter ego, by-passing the limited partners in the Shallow Rig Syndication; then to ask this Court to exercise its equitable powers by affirming these transfers.

## CONCLUSION

In any case dealing with the doctrine of equitable estoppel, the Court must balance the equities of the various parties involved and apply the doctrine on a case-by-case basis. Given the foregoing stipulation of facts and findings of law, this Court does not conclude that the doctrine may be invoked in favor of the Company or LaTerre.

In light of the above finding of facts and conclusions, therefore, the monies paid into Court by Devon constitute a receivable of the Shallow Rig Syndication.

IT IS SO ORDERED.

Pursuant to B.R. 752 this Memorandum Opinion constitutes the findings of fact and conclusions of law.