**In re Stanley B. BRITT, Jr. and Mildred D. Britt, Debtors.**

**Clyde O. BODIE, Jr. and Mary A. Bodie, Plaintiffs,**

**v.**

**Stanley B. BRITT, Jr., Defendant.**

**Bankruptcy No. 92–33104–S.**
**Adversary Proceeding No. 92–3150–S.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

June 14, 1993.

Michael A. Condyles, Maloney, Yeatts & Barr, Richmond, VA, for plaintiff.

Robert Cantor, Cantor & Cantor, Richmond, VA, for defendant.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes before the Court on both the complaint of Clyde O. Bodie ("Bodie" or "plaintiff") and Mary A. Bodie to determine dischargeability of debt filed October 2, 1993, and the counterclaim of Stanley B. Britt ("Britt" or "defendant") against Bodie, in the answer filed on November 3, 1992, for default on a promissory note. The Bodies allege that Britt owes them $25,000 and prays that this Court determine such debt to be nondischargeable under the 11 U.S.C. § 523(a)(2), (4), and (6) exceptions to discharge provisions of the Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code"). The Bodies allege that Britt, a real estate agent, breached his fiduciary duty by converting $25,000 held in

escrow on their behalf, and obtained the money from them by false pretenses, false representation, or actual fraud. Britt denies that the escrowed funds belonged to the Bodies. He claims that he deposited the money into the escrow account and that the money belonged to him and his wife. Britt counterclaims that Clyde Bodie owes the defendant $20,400 on a promissory note, an allegation that Bodie denies. Britt filed his petition under Chapter 11 of the Code on June 25, 1992. This Court has jurisdiction to determine dischargeability of a debt pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 523. After considering the evidence and arguments of counsel heard during trial held May 10, 1993, this Court makes the following findings of fact and conclusions of law.

### Findings of Fact

## I. Introduction

Some background information will more fully illuminate the facts surrounding the complaint and counterclaim. Bodie and Britt became acquainted in the early 1950s during their college years. Bodie became an engineer and land surveyor in the metropolitan area of Richmond, Virginia, and Britt became a land developer and real estate broker, principally in an area south and west of Richmond. Although they had some remote social connections, their relationship was mostly professional due to their respective occupations. Britt created limited partnerships, for which he would act as general partner. Other investors would buy in to the partnership as limited partners, and the partnership would acquire title to tracts of land to hold for speculation or development.

Bodie, with a 10% interest, was one of eight limited partners of Clay–Brown Associates, Ltd. ("Clay–Brown, Ltd."), which owned property at Newby's Bridge Road. Britt was the general partner. Clay–Brown, Ltd., was one of the three limited partnership partners of the MLHB Planning Partnership, another partnership set up by Britt. The MLHB Planning Partnership sold the property on Newby's Bridge Road as part of the MLHB Planning Part-

nership transaction. A portion of the proceeds of the MLHB sale is the subject of this dispute.

## II. The Complaint

Upon becoming aware that the Huddleston property adjoining his home place came on the market for sale, Bodie asked Britt to make an offer in Britt's name for its purchase. Since the property for sale was next door, Bodie did not want to be recognized as the prospective purchaser. On March 29, 1989, Stanley A. Britt, as President of Stanley Britt Associates, Inc., ("S.B.A.") executed a real estate sales contract on behalf of "S.B.A. or assigns" for the purchase of 1763 May Way Drive, Powhatan, Virginia, from the owners, Randy and Suzanne Huddleston (the "sellers"). Plaintiff's Exhibit 1. On that same day, Bodie paid to Stan Britt the $500 deposit called for by the contract. There were two unusual conditions to the contract. First, the contract was "subject to closing on purchaser's property located at Newby's Bridge Rd." in Chesterfield County, Virginia. Second, the purchaser must confirm the closing mentioned in the first condition and deposit $25,000 into escrow by April 30, 1989. It appears to this Court that the closing mentioned in the contract is a clear reference to the MLHB Planning Partnership transaction mentioned *supra*. These conditions obviously benefitted the purchaser of the property since failure to satisfy the conditions would void the purchaser's obligation under the contract.

On April 28, 1989, Britt wrote a letter to the sellers in which he informed them of the satisfaction of the two contingencies to the contract, i.e. the closing of the Newby's Bridge Road sale and the $25,000 deposit in escrow, and of his intent to close the sale upon the terms and conditions stated therein. Plaintiff's Exhibit 6. On that same day he executed a handwritten assignment of the contract to the Bodies. Plaintiff's Exhibit 3. Also on April 28, Britt deposited $25,000 into the S.B.A. Escrow Account and sent copies of the deposit slip to the sellers as proof of having fulfilled that condition of the contract.

Britt signed an affidavit on June 6, 1989, swearing under oath that he, in the name of S.B.A., entered into the contract as agent for the Bodies for the purpose of purchasing the real estate on behalf of the Bodies. Plaintiff's Exhibit 2. Bodie stated he needed this statement to assure his lender that he had an interest in the property. The affidavit acknowledged the previous assignment of the contract to the Bodies on April 28, 1989. *See* Plaintiff's Exhibit 3. Shortly thereafter, Bodie procured a commitment for a loan in the amount of $75,000 from Dominion Bank to purchase the property. He paid the bank a 1% commitment fee. Plaintiff's Exhibit 4.

The sellers, upon being advised that Britt assigned the contract to Bodie, their next-door neighbor, stated they intended not to settle. Bodie retained counsel and brought an action for specific performance in the Circuit Court of Powhatan County, Virginia. The sellers, in turn, sued Britt, and the cases were consolidated (the "Powhatan suits"). Bodie's counsel proceeded with the litigation and over the next several months asked Britt or Britt's attorney to transfer the escrowed funds to his attorney's escrow account so that he would be prepared to tender performance of Bodie's obligation under the contract. Bodie was without other funds to make the down payment. Britt, through his attorney, equivocated. Only later did Bodie realize that Britt had withdrawn the money from the escrow account.

The bank records of the S.B.A. Escrow Account reflect a $25,000 deposit on April 28, 1989. By June 22, 1989, the account balance reached $26,191.07. On November 6, Britt withdrew $3,000; on November 9, $2,000; on November 24, $11,000; on December 1, $4,000; on December 4, $4,000; and on December 29, $1,200; leaving a balance in the account of $991.07. Plaintiff's Exhibit 18. Britt made these withdrawals by check made payable to Stan Britt. Bodie ultimately had to dismiss the specific performance suit. He contends that his inability to assure performance of the contract by producing the $25,000 down payment precluded him from proceeding with the suit or purchasing the Huddleston property.

Bodie contends that the $25,000 deposited to the S.B.A. Escrow Account was his money from his interest in the sale of the Newby's Bridge Road property mentioned as a contingency in the Huddleston contract. Bodie alleges that Britt placed the money in that account in order for Bodie to perform on the contract. He had agreed with Britt to make a $25,000 down payment and finance the balance. Bodie testified that he did not have the down payment money and Britt proffered the $25,000 as Bodie's interest from the MLHB sale of the Newby's Bridge Road property. The MLHB partnership contracted to sell and did sell to Belmont Associates of Five Forks, L.P., properties of the partnership along Bailey's and Newby's Bridge Roads in Chesterfield County, Virginia, on April 17, 1989, for the sum of $3,400,000.

According to the settlement statement, Britt or his corporation was entitled to a $340,000 brokerage fee, $200,000 in reimbursement for zoning fees and costs, and it seems he received for the MLHB Partnership the sum of $142,942.32. Plaintiff's Exhibit 15. A portion of the monies due to Britt for the commission and the rezoning fee were to be paid to third parties. These sums total $417,554.16. The purchasers also executed and delivered a note for $500,000. It may be that Britt received on behalf of the MLHB Partnership $139,746.60 previously held in escrow pending execution of a guaranty agreement for the construction of a sewer. Britt testified that the settlement concluded within the week. It appears to this Court that the MLHB transaction settled by April 24, 1989, at the latest, prior to the confirmation of the Huddleson contract by letter dated April 28, 1989. *See* Plaintiff's Exhibit 6: Letter from Britt to the sellers (confirming the fulfillment of conditions to the contract and giving notice of the intent to close the sale). This Court finds that Britt knew or should have known whether or not Bodie's interest in the Clay–Brown partnership entitled him to any profit in the MLHB transaction at the time Britt made the escrow deposit and confirmed the contract.

Britt claims that the MLHB partnership yielded no profit for Clay–Brown, Ltd., and therefore the $25,000 he placed in escrow could not have belonged to Bodie. Regarding Britt's assertion, his accountant, E. Douglas Wright, testified that he prepared work papers reflecting the allocation of sales proceeds of the MLHB transaction. Wright admitted that Britt asked him to prepare the report to show disappointed limited partners where all the money went. On page "D" of the work papers, an entry reads:

| Date | | Charged to Partner-ship | Paid by Britt |
|------|--|-------------------------|---------------|
| 4/10 | Bodie—Consult | $25,000 | $25,000 |

Plaintiff's Exhibit 10: Accountant's Work Papers, page "D" 1.27. The accountant's work papers closely parallel entries reflected in the MLHB General Ledger prepared under Britt's direction. Two entries on the MLHB General Ledger read:

| 04/20/89 | Clyde Bodie—Consulting | Acct. 2149 | $25,000 |
|----------|------------------------|------------|---------|
| 04/20/89 | Clyde Bodie—Consulting | Acct. 6256 | $25,000 |

Plaintiff's Exhibit 11: MLHB General Ledger. The accountant's notes reflecting miscellaneous expenses of the MLHB Planning Partnership reveal an entry reading:

| 8. Bodie Consulting Fee | 4/20/89 | $25,000 |
|-------------------------|---------|---------|

Plaintiff's Exhibit 12, p. 3, item 8: Notes reflecting allocation of expenses of MLHB Planning Partnership—Misc. This Court finds from the testimony of the accountant and the exhibits admitted in evidence that Britt included in his calculation of the expenses paid out of the MLHB settlement a $25,000 payment to Bodie. It appears to this Court that Britt claims that he made this payment to Bodie in an effort to justify his reimbursement from the MLHB settlement funds. Bodie argues that this payment represents the $25,000 placed in escrow on Bodie's behalf under the real estate sales contract. Britt presented no contradictory evidence that he paid the consulting fee by any other means.

In discovery depositions taken on May 1, 1990, in the Powhatan lawsuits, Britt testified that Bodie was an engineer who would do engineering work for Britt personally on property Britt owned personally and through his interest in various limited partnerships. Plaintiff's Exhibit 21 at 6 1.18: Deposition of Stanley Britt taken in connection with Powhatan suits. Britt also testified that Bodie asked him to look at the Huddleston property on his behalf, and after further discussion, Bodie asked Britt to buy the property for him. *Id.* at 16 1.16, 19 1.11–13. Britt told Dot Mays, the seller's agent, that his "offer to purchase would be subject to another property closing. Of course that's where the funds would come from." *Id.* at 18. Britt testified further in the deposition that Bodie instructed him regarding the Huddleston property "that if we were going to close the other deal, to go ahead and execute a contract on it." *Id.* at 20 1.1. Britt admits that Bodie's money was going to be used to purchase the property. *Id.* 1.19–21. Britt further admits that the $25,000 was a portion of the pro-

ceeds of the sale of the Newby's Bridge Road property. *Id.* at 29 1.10–18.

### III. The Counterclaim

Britt alleges by counterclaim that Bodie still owes the $20,400 that Britt lent him to buy into the Clay–Brown partnership. The Clay–Brown Limited Partnership Agreement which formed the partnership, dated September 11, 1978, provided that Bodie pay for his interest in the partnership by performing surveys and engineering services for the partnership having a minimum value of $10,200. Plaintiffs' Exhibit 9, ¶ 2. Bodie stated that he did not have the money to make a capital contribution at the formation of the partnership, and that he and Britt understood that Bodie would contribute his services in lieu of any payment to the partnership. In conjunction with Bodie becoming a limited partner, Bodie executed a promissory note, the subject of the defendant's counterclaim, for $20,400 payable to Britt in equal annual installments over a period of ten years, plus interest. Bodie also guaranteed 10% of a $204,000 note given by Clay–Brown, Ltd., to The Bank of Powhatan as security for a loan made to purchase the real estate owned by the partnership. This Court finds that Bodie's 10% guarantee is indicative of his 10% ownership interest in the Clay–Brown partnership.

It appears to this Court that Bodie rendered engineering services to Britt personally and to Britt as general partner of Clay–Brown, Ltd. At Britt's request, Bodie completed at least two land use plans which this Court finds as having a value in excess of the $20,400 note given by Bodie to Britt. It also appears to this Court that although Bodie's land surveying and engineering corporation rendered services for which it was compensated, Bodie's personal services, which were independent of and did not involve his corporate identity, were not billed by him or his corporation. In addition to doing engineering work for Britt, Bodie also contributed cash. Bodie made two payments of approximately $3,000 each on the $204,000 Clay–Brown, Ltd., note held by the Bank of Powhatan. Other payments to Britt include:

- March 23, 1988, a $10,000 check drawn on Bodie's partnership account in Chesco Associates, made payable to Britt;
- October 1, 1979, a personal check made payable to Clay–Brown Associates in the amount of $3,690.20 endorsed and cashed by Britt, *see* Plaintiff's Exhibit 7;
- November 9, 1984, a check in the amount of $2,000 and another check in the amount of $13,000, drawn on United Virginia Bank to Britt, for the benefit of Clay–Brown partnership, as testified to by Bodie.

The total of these payments amounts to $34,690.20. Bodie testified he was not engaged in any other business venture with Britt and this Court finds that the note executed by Bodie was in consideration for his acquisition of the partnership interest. No other credible evidence exists to refute this claim. It is clear from the evidence that Bodie has contributed more in cash and services to Britt and Clay–Brown, Ltd., than that required of him to pay for his interest in the partnership.

Bodie contends that Britt is judicially and equitably estopped to deny that the money placed in the escrow account belonged to Bodie. Having established that the escrowed funds were his, Bodie alleges a nondischargeable conversion and defalcation in a fiduciary capacity of those funds when Britt withdrew the money from escrow. Bodie also argues that Britt, as the principal broker of his firm, is a principal to the Huddleston transaction, and alleges Britt violated the regulations imposed upon brokers which govern escrowed funds.

### *Conclusions of Law*

■ The case of *Devon Energy Corp. v. Utica National Bank and Trust (In re Project 5 Drilling Program–1980)*, 30 B.R. 670 (Bankr.W.D.Okla.1983) describes the doctrine of equitable estoppel. A party who knows or should know the truth is absolutely precluded from denying any material fact upon which he has induced another, who was excusably ignorant and had

a right to rely on the true facts, to change his position in such a manner that he would suffer injury if such denial was allowed. *Id.* at 674 (citing *Arizona ex rel. Gaines v. Cooper Queen Consolidated Mining Co.,* 233 U.S. 87, 34 S.Ct. 546, 58 L.Ed. 863 (1914)). The *Devon Energy* case lists several requirements that need to be met in order to invoke the doctrine of equitable estoppel.

> First, there must be false representation or concealment of facts made with actual knowledge or constructive knowledge of its falsity. Second, the receiving party must have been without knowledge of the truth or the means for making such determination. Third, the statement must be made with the intent that it be acted on. Last, the receiving party must have acted upon it to his detriment.

30 B.R. at 674. This Court recognizes the application of equitable estoppel under Virginia law to cases in bankruptcy. *See Alessio v. Adkins (In re Adkins),* 102 B.R. 485, 488–89 (Bankr.E.D.Va.1989) (citing *Coleman v. Nationwide Life Ins. Co.,* 211 Va. 579, 179 S.E.2d 466, 469 (1971); *Trayer v. Bristol Parking,* 198 Va. 595, 95 S.E.2d 224, 231 (1956) (equitable estoppel used to defeat a statute of limitations defense)).

■ It appears to this Court that the facts presented in this case fulfill all the requirements for the invocation of the doctrine of equitable estoppel to determine the ownership of the $25,000. Bodie testified that Britt told him that Bodie would place his portion of the proceeds of the sale of the MLHB property in escrow as down payment on the purchase of the Huddleston property. Bodie, being a limited partner and with no way of ascertaining the truth of Britt's statement, had a right to rely on what Britt, the general and managing partner, told him. In reliance upon Britt's representations, Bodie changed his position. He entered into a binding real estate sales contract, acquired an equitable interest in the Huddleston property, paid Britt a $500 earnest money deposit, procured a loan, and paid Dominion Bank a 1% loan origination fee. When the sellers refused to close, Bodie hired counsel and instituted a specific performance lawsuit to enforce the contract, all the while believing Britt's representation that the $25,000 belonged to him and would be used to tender performance under the contract.

Reliance on Britt's representation caused Bodie to suffer damages. Believing that the $25,000 in escrow was for his benefit, Bodie failed to demand repayment of the escrow money until it was too late, Britt having withdrawn it all. Bodie paid Britt $500 in earnest money and paid Dominion Bank a $750 loan origination fee. Bodie incurred legal fees and court costs with respect to the specific performance lawsuit. When Britt's withdrawal of the escrow money ultimately forced Bodie to abandon his specific performance lawsuit, Bodie lost the interest he had in the Huddleston property. Considering the fact that Bodie's reliance on Britt's representation caused Bodie to incur loan fees and the expense of litigation, and to lose his interest in the Huddleston property, this Court finds that Bodie was damaged to an extent greater than the $25,000 he now seeks to have determined nondischargeable. Because Britt's actions caused Bodie to change his position to his detriment, Britt cannot come into this Court and allege that the $25,000 never belonged to Bodie.

Not only is Britt estopped to deny the escrowed funds belonged to Bodie, but it also appears to this Court that Britt intended to and did distribute to Bodie $25,000 as his portion of the profits of the MLHB transaction to accommodate Bodie in the purchase of the Huddleston real estate. It is the Court's belief that Britt was acting as agent for Bodie at the time of the execution of the contract. Britt placed $25,000 in escrow upon the closing of the MLHB transaction. At the same time, Britt assigned his interest in the Huddleston contract to Bodie and wrote to the sellers of his intention to close the contract on its terms. The formation and assignment of the Huddleston contract coincided with the sale of the MLHB real estate. The evidence is not clear that the Clay–Brown real estate was part of the MLHB transaction, but the evidence is clear that Clay–Brown was a partner of MLHB and that Bodie

was a limited partner of Clay–Brown, Ltd. This Court finds that Bodie had a limited partnership interest in the MLHB transaction.

■ At the closing of the MLHB transaction, proceeds of that sale were transferred to one or more of Britt's checking accounts, and then Britt wrote a check for $25,000 from his personal checking account to the S.B.A. escrow account. Britt entered this payment on the MLHB General Ledger as consulting services and instructed his accountant to include this payment on the settlement report he hoped to use to convince other disgruntled limited partners that he was entitled to MLHB proceeds as reimbursement. This evidence leads the Court to two possible conclusions, both of which are against Britt's interest. Britt intended to make Bodie either a payment for consulting services or a partnership draw disguised as a payment for services. In either event, and in view of all the contradictory evidence, this Court cannot believe Britt's statement that the $25,000 placed in escrow was not Bodie's.

In determining whether this debt should be declared nondischargeable this Court notes the Real Estate Board Regulations governing brokers such as Britt. The regulations provide specific guidelines for disbursing funds held in a real estate company escrow account. The regulations require that funds placed in an escrow account shall remain in that account until the transaction has been consummated or terminated. Those provisions require that, in the event the transaction is not consummated, the broker shall hold such funds in escrow until:

1. All parties to the transaction have agreed in writing as to their disposition; or

2. A court of competent jurisdiction orders such disbursement of the funds; or

3. The broker can pay the funds to the party who is entitled to receive them in accordance with the clear and explicit terms of the contract which established the deposit. In the latter event, prior to disbursement, the broker shall give written notice to each party by either (i) hand-delivery receipted for by the addressee, or (ii) by regular and certified mail, that this payment will be made unless a written protest from a party is received by the broker within thirty days of the delivery or mailing, as appropriate, of that notice. A broker who has carried out the above procedure shall be construed to have fulfilled the requirements of this regulation.

Real Estate Board Regulations § 5.3(B)(1) at 16–17 (effective October 1, 1989, and in force at the time of the withdrawals from escrow). The customary procedure of Stan Britt Associates, Inc., for handling escrow funds complies generally with these regulations. *See* Plaintiff's Exhibit 19: Answer to Plaintiff's Interrogatory No. 4. In his answer to the interrogatory requesting him to describe the practice for handling escrowed funds, Britt responds that "Funds in connection with real estate sales would be deposited in escrow account and paid to seller or designated parties if closed or returned to the owners if not closed or contract is voided." *Id.*

■ It appears to this Court that Britt failed to comply with either the Real Estate Board Regulations or his own customary practices. He withdrew the funds while the contract was subject to a specific performance lawsuit, still subject to closing and not voided, and without the benefit of a court order. He paid the escrowed funds to himself when he was no longer a designated party to the contract, having assigned all his interest in the contract to Bodie. He withdrew the funds without the written agreement of all parties to the transaction, nor did he follow the regulation allowing payment to the party entitled to receive the funds in accordance to the clear and explicit terms of the contract. It appears to this Court that Britt's act of withdrawing the escrowed funds constitutes a defalcation in his fiduciary capacity as trustee of Bodie's down payment money.

On the issue of the counterclaim, it appears to this Court that Bodie made sufficient contributions to Clay–Brown, Ltd.,

and to Britt personally, by rendering services to the partnership and to Britt and payment of monies by check written to Britt and to the partnership to satisfy both his obligation to the partnership, as contained in the partnership agreement, including his obligation under the promissory note made payable to Britt. For that foregoing reason, the counterclaim should be dismissed on the grounds of satisfaction of the debt. However, since Britt is the counterclaimant, not the partnership, this Court would be reluctant to rule at this time on any cause of action that Clay–Brown, Ltd., might asserted against Bodie.

 For Britt to intentionally place Bodie's money in escrow and then remove the $25,000 from his corporate escrow account, without authority from or notice to Bodie or knowledge given to him, constituted fraud under § 523(a)(2)(A). *In re Adkins*, 102 B.R. at 488–89; *see also In re Bosselait*, 63 B.R. 452 (Bankr.E.D.Va. 1986). It is clear to this Court that Britt converted Bodie's $25,000 by deliberately and intentionally withdrawing Bodie's money from the escrow account, in knowing disregard for Bodie's rights to the money. Britt's act of conversion constitutes willful and malicious injury to another's property, the debt arising from which is nondischargeable under 11 U.S.C. § 523(a)(6). *See Vaughn v. Murry (In re Murry)*, 116 B.R. 476 (Bankr.E.D.Va.1990). In addition, Virginia real estate law imposed a fiduciary responsibility upon Britt, as Bodie's agent, and his fraudulent act of removing the funds from escrow constituted a defalcation while acting in a fiduciary capacity as described in § 523(a)(4) of the Bankruptcy Code. *See Goldberg v. Wolfington (In re Wolfington)*, 47 B.R. 762 (Bankr.E.D.Pa. 1985) (citing *Hamby v. St. Paul Mercury Indemnity Co.*, 217 F.2d 78 (4th Cir.1954). Britt was aware that he was acting as agent for Bodie in the execution of the contract for the purchase of that property. He violated his responsibility under Real Estate Board Regulations § 5.3(B)(1), authorized under Va.Code § 54.1–2105 (Repl.Vol.1991), when he withdrew those funds by a series of checks made payable to himself, without notice to or knowledge

of the other parties to the transaction, and particularly Bodie, who became a principal upon the execution of the contract. For the above reasons, this Court believes that Bodie is entitled to judgment in the amount of $25,000 and that the debt as arising therefrom should be determined to be nondischargeable in bankruptcy under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4). The Court can find no basis for judgment in favor of Mary A. Bodie and she should be dismissed as a party plaintiff to the action. An appropriate Order in conformity with this Memorandum Opinion shall issue.