In re Hunter Carpenter SCOTT, Debtor.

Sharon A. SHAPPY, Plaintiff,

v.

Hunter C. SCOTT, Defendant.

Bankruptcy No. 95–31217–S.
Adversary No. 95–3077–S.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Aug. 27, 1996.

Peter Skoro, Fairfax, VA, for Plaintiff.

W.R. Baldwin, III, Hirschler, Fleischer, Weinberg, Cox & Allen, P.C., Richmond, VA, for Defendant.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes before the Court on a complaint filed by Sharon A. Shappy ("Mrs. Shappy" or Plaintiff) alleging the existence of a debt owed her by Hunter Carpenter Scott ("Scott" or the Debtor). Mrs. Shappy's complaint further alleges that the debt owed her by Scott should be determined nondischargeable under 11 U.S.C. §§ 523(a)(2) and 523(a)(4) of the Bankruptcy Code.

This is a core proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(I). After considering the evidence presented at trial, the arguments of counsel at trial in post-trial briefs, and the relevant law, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

In late 1987, Scott owned and operated a business brokerage, and was a real estate agent studying to be a broker. Scott had entered into an arrangement with a real estate broker, Hallberg & Sullivan ("Hallberg"), whereby Scott would use the Hallberg brokerage to complete real estate sales transactions, and Hallberg would retain 10% of any commission paid.

During this same time period, Scott became involved with Bryan T. Brooks ("Brooks"), who was a land developer, real estate agent and future real estate broker. Brooks contemplated using Scott to assist him in purchasing land located in the southern half of Spotsylvania County, Virginia. Toward that end, Scott and Hallberg negotiated a broker agreement (the "Broker Agreement"), wherein Scott agreed to work as agent for Brooks, and Brooks agreed to pay a 5% commission for each purchase of land within Spotsylvania County during a two-year period commencing on February 22, 1988. Scott prepared the Broker Agreement from a boiler-plate provided by Brooks, but all signatories initialed changes to the document. The Broker Agreement required Scott to use his "best efforts" to procure offers to sell tracts of land in the subject area. Brooks executed the Broker Agreement on February 26, 1988. Scott and Neil Sullivan ("Sullivan"), representing Hallberg, executed the Broker Agreement on March 1, 1988.

At a point in time prior to the Broker Agreement's execution, an associate of Scott, James Brittingham ("Brittingham") approached Mrs. Shappy and her husband, John L. Shappy, regarding the potential sale of property owned by the Shappys (the "Shappy Property"), located in Spotsylvania County. The Shappy's had held this unim-

proved property for several years and hoped to eventually create a campground. The evidence was unclear with respect to when Brittingham first approached the Shappys. Mrs. Shappy contends that she first spoke to Brittingham on February 25, 1988 while Scott stated that he believed it was some time before that date. Unfortunately, John L. Shappy died prior to the commencement of this adversary proceeding, and Mrs. Shappy testified that her husband conducted nearly all of the negotiations. It is possible, therefore, that John L. Shappy spoke with or met Brittingham prior to the date identified by Mrs. Shappy without her knowledge. Mrs. Shappy testified that after a meeting with Brittingham on February 27, 1988, Brittingham called the Shappys on the next day to state that he had a contract on the Shappys' property.

Scott testified that Brittingham brought the Shappy transaction to him, including a price given to Brittingham by John Shappy. Scott testified that he conferred with Shappy prior to drawing up a purchase contract (the "Purchase Contract"), which contemplated a $250,000 sale price for the Shappys' 50 acre parcel of land. The Purchase Contract was an all cash contract, and also included a $25,000 brokerage fee commission. Brooks executed the Purchase Contract as buyer on February 28, 1988. The Shappys met with Scott a week later, on March 5, 1988. But prior to executing the Purchase Contract the Shappys demanded that Scott increase the original $250,000 sale price contained therein.

Testimony regarding this amendment to the Purchase Contract was very inconsistent. Mrs. Shappy stated that she and her husband objected to the amount of the sale commission, particularly based upon the swiftness with which Scott had located a buyer, and Shappys required that the price be increased or the commission reduced. The Shappys made this demand notwithstanding the fact that a 10% sales commission was considered standard for the type of rural property involved in this transaction.

Mrs. Shappy also testified that after she and her husband made this demand, Scott spoke with Brooks by phone in a separate room, such that the Shappys did not hear the Scott–Brooks conversation. Scott, on the other hand, testified that he spoke with Brooks by telephone while remaining in the same room as the Shappys. Although Scott initially testified that he told Brooks that the price increase was necessary because of a change from an all cash to a partial cash sale, Scott later stated that this testimony was incorrect, and that he didn't remember the reason he gave to Brooks for the requested increase in price. The price increase did not change the amount of the sale commission, but simply increased the gross sale price from $250,000 to $261,000, thereby creating a net $11,000 increase to the Shappys.

The parties amended the Purchase Contract two times after its initial execution, apparently at the request of the purchaser. The First Addendum, executed on April 9 and 11, 1988, by the Shappys and Brooks respectively, permitted Brooks to back out of the agreement during a 60 day study period, and changed the terms of the sale from all cash to $161,000 in cash and $100,000 in the form of a five-year, 12% note secured by a deed of trust. The Second Addendum, executed on May 16 and 19 by the Shappys and Brooks respectively, changed the Purchase Contract by permitting the "Purchaser" to seek a first priority mortgage loan for the $161,000 in cash to be received by the Shappys, and for Shappys' note for the remaining $100,000 to be secured by a second priority deed of trust.

On the same date that the Shappys executed the Second Addendum, May 16, 1988, a friend of the Shappys, Lou Guthrie, ("Guthrie"), who along with his wife (collectively referred to as the "Guthries"), owned adjoining property, contacted Shappy to say that he and his wife were selling the adjoining property to Brooks. Shappy went to Guthrie's home, and returned with a copy of the Broker Agreement, which agreement had been attached to the Guthries' real estate purchase contract. While the Purchase Contract specifically called for the Shappys to pay the brokerage fee and commission of $25,000 at closing, the Guthries' Contract, which had the Broker Agreement attached, stated that Brooks would pay the commission in accordance with the Broker Agreement.

The Guthries' Contract was executed by Brooks on April 29, 1988, and according to its terms, contemplated paying the Guthries approximately $5,000 per acre for the adjoining land, about the same price paid for the Shappy Property. There is no evidence before the Court that the Guthrie–Brooks sale was actually completed, but the Court infers this fact based upon the testimony of the parties.

After learning of the existence of the Broker Agreement, Shappy contacted his attorney, Ronald Maupin, ("Maupin"). Maupin wrote a letter to Scott's attorney, Michael Barrett, dated May 17th, outlining the Shappys' agitation, and wrote a second letter, dated May 25th. The May 25th letter stated that the Shappys believed that Scott was involved in dual representation, and that the Shappys were unwilling to close on the scheduled date of May 31, 1988.

Scott, Brooks and Sullivan all testified that the Broker Agreement did not apply to the Shappys' Purchase Contract since that transaction was already in progress, notwithstanding the fact that a literal reading of the terms of the Broker Agreement would indicate that the Broker Agreement would have included that Purchase Contract. This Court finds as a matter of fact that the Broker Agreement did not apply to the Shappy Purchase Contract. Scott also testified that he did not disclose confidential information obtained from the Shappys to Brooks, and that Scott represented only the Shappys during the relevant discussions related to the transaction. Scott stated that the Shappys never specifically asked him if he represented Brooks prior to executing the Purchase Contract, and that based upon the circumstances, Scott was not obligated to disclose the Broker Agreement since it did to relate that the Shappys' transaction.

Scott went to the Shappys' home on May 27, 1988, apparently in order to attempt to persuade the Shappys to go through with the sale. Scott met with the Shappys for a lengthy period, some two to four hours, during which Scott spoke with Mr. and Mrs. Shappy together and separately, and during which time Scott allegedly made emotional pleas to the Shappys. Mrs. Shappy testified that Scott told her he needed the money that would come from this sale since he had already obligated that money to other parties. With respect to the Broker Agreement, Scott told the Shappys that it did not apply to their contract, but that he probably should have told them about it anyway. Scott stated that he regretted not telling the Shappys about the Broker Agreement, but apparently never stated that he was required to do so, and asserted instead that he believed that he was not required to them. During the meeting, Scott also apparently offered to provide the Shappys with business brokerage services at no charge. Scott characterized this offer as a goodwill gesture to soothe the Shappys' hurt feelings, but stated that his willingness to help the Shappys was not an indication of guilt. Mrs. Shappy testified that Scott promised to do work to make up for his behavior, and that absent Scott's offer, the Shappys would not have gone ahead with the closing. Scott left this May 29, 1988 meeting without the Shappys' final decision.

Ultimately, the Shappys did convey the Shappy Property according to the terms of the Purchase Contract and First and Second Addendum at a closing scheduled and held on May 31, 1988. But the Shappys did not sell the property to Brooks. At some point in time, Brooks assigned his rights to a third party, Charles A. Shaw. Although the testimony at trial was contradictory, Scott stated that he believes that he told the Shappys about this assignment prior to the Shappys' May 16th execution of Second Amendment. It would appear that the Second Amendment came about as a result of the assignment, and that unlike Brooks, Shaw would have to seek a first priority mortgage loan in order to complete the cash portion of the transaction.

Mrs. Shappy claimed that she did not learn about Shaw or the assignment until the closing, and that she was deceived into signing the Second Addendum. Mrs. Shappy claimed that Scott told her that the Second Addendum, which subordinated her note to that of the other mortgage lender, actually resulted in the Shappys being better secured since the Second Addendum also required the signer of the note to provide a personal guaranty. The subordination aspect of the

Second Addendum was apparently never pointed out to the Shappys, nor apparently did they seek advice of counsel with respect to the Second Addendum. Counsel for Mrs. Shappy pointed to at least two discrepancies between Scott's testimony before this Court and his admissions and testimony in an earlier state court proceeding with respect to the timing of his knowledge of the Shaw assignment and Scott's disclosure to the Shappys. Scott stated that he thought he told the Shappys about Shaw prior to May 16th and the Second Addendum, but Scott's state court testimony was that he didn't know about Shaw until just prior to closing.

Mrs. Shappy's counsel asserted that Scott was aware of the eventual assignment from the beginning of the transaction, and characterizes Scott's behavior in securing the Shappys' signature on the First and Second Addendums as manipulation by Scott and an example of Scott's representation of Brooks rather than the Shappys. However, the evidence, taken as a whole, does not adequately support such an allegation. In any event, the Shappys were paid in full for their property according to the terms of the Purchase Contract as amended.

Mrs. Shappy testified that although she did not feel legally obligated to complete the Shappy Property sale, she and her husband did so anyway based upon Scott's offer to provide free business brokerage services and because Scott stated that the Shappys' failure to close would result in lengthy litigation. Mrs. Shappy's complaint in this adversary proceeding states that the Shappys went through with the closing based upon legal threats by Scott and Hallberg. Maupin, the Shappys' attorney at the time, testified that he advised against completing the sale since he believed the Shappys were not legally obligated to close. Nonetheless, the Shappys apparently chose to ignore his advice, closing on the property sale on May 31, 1988. Hallberg received the $25,000 commission as a result of the sale, kept $2,500, and turned the remainder over to Scott. Scott apparently paid Brittingham, the original point of contact, a portion of that sum.

After the Shappys closed on the sale, Scott apparently sent the Shappys an agreement wherein he would perform work for no fee in exchange for a release by the Shappys. That agreement was never executed by the parties, and Scott apparently never performed business brokerage services for the Shappys.

Nearly two years after the sale closed, John L. Shappy contacted Maupin and soon thereafter, Maupin initiated a suit against Scott and Hallberg seeking the return of the $25,000 commission and $250,000 in punitive damages. Mrs. Shappy did not completely explain the two year period of inaction. Mrs. Shappy stated that she and her husband only then became aware of the relevant real estate regulations, notwithstanding the fact that Maupin had apparently counseled them not to go forward with the sale some two years previously. Mrs. Shappy stated that she was probably aware that Shaw had resold the Shappy Property for $1.5 million at about the time they contacted Maupin, but Mrs. Shappy denied that this was a reason for initiating legal proceedings.

The Shappys' state court action has not yet been completed, although neither party offered any explanation for the six year delay. The trial was eventually stayed as a result of Scott's bankruptcy filing in the Spring of 1995.

Scott testified that the Shappy sale did not fall within the Broker Agreement, and that he was under no duty to disclose his relationship with Brooks outside of the Shappy sale. Scott offered into evidence a number of purchase contracts which were consummated under the Broker Agreement, all of which contained language referring to the Broker Agreement, and all of which contained a copy of the Broker Agreement as an attachment. Moreover, the Shappys did not put forth any evidence that Scott received any commission or fee from Brooks with respect to the Shappy Purchase Contract.

Mrs. Shappy did call one expert as a witness. Frances Brintley ("Brintley") testified as an expert in the real estate agent and brokerage business. Brintley testified that under these circumstances, where the Broker Agreement did not specifically apply to the Shappy sale transaction, that Scott was under a duty to disclose his relationship with

Brooks. Brintley made this statement notwithstanding the fact that the relevant Virginia Real Estate Board Regulations explicitly indicate a duty to disclose dual representation relationships only within a "transaction," but not within related or other transactions. The effectiveness of Brintley's testimony was somewhat diminished by her constant references to requirements within her office or business, rather than basing her answers upon custom and practice in general in the relevant area even when asked to do so.

### Conclusions of Law

Mrs. Shappy grounds her nondischargeability complaint upon 11 U.S.C. § 523(a)(2)(A),[1] alleging fraud and misrepresentation, and upon 11 U.S.C. § 523(a)(4),[2] alleging fraud and defalcation while acting in a fiduciary capacity. Mrs. Shappy asserts that Scott wrongfully acted as a dual agent in simultaneously representing both herself and her husband as sellers and Brooks as buyer in the same real estate transaction without providing necessary disclosure and obtaining written consent. Mrs. Shappy further alleges that this dual representation, or the fraudulent concealment of Scott's agency relationship with Brooks even if there existed no technical "dual representation," constituted an intentional misrepresentation and resulted in nondischargeable damages related to the sale of Mrs. Shappy's property. Mrs. Shappy also contends that Scott compromised his fiduciary duty to her by withholding information regarding Brooks' financial circumstances, and by deciding to double his own compensation in the Shappy transaction to the detriment of Mrs. Shappy and to the benefit of himself and Brooks without full disclosure to Mrs. Shappy.

After fully considering the evidence and argument presented by counsel, the Court determines that this proceeding presents two fundamental issues. Is a Virginia real estate agent required to advise his client that he has entered into an agreement with a third party regarding similar and nearly contemporaneous sales of property when that agreement contemplates terms which, if the client were included, would benefit the client to the detriment of the agent? Moreover, if the real estate agent fails to make such a disclosure, whether or not required to do so by relevant Virginia Real Estate Board Regulations, can that failure constitute a basis for nondischargeability under sections 523(a)(2)(A) or 523(a)(4) of the Bankruptcy Code? Ultimately, in the context of the facts herein, the Court concludes that the answer to both of these questions must be "no."

■ Placing its analysis within the context of the Bankruptcy Code, the Court will look first at nondischargeability under § 523(a)(2)(A), and then at § 523(a)(4). This Court has previously held that a debt will be determined nondischargeable under § 523(a)(2)(A) if the creditor proves that:

(1) the debtor made the misrepresentations;

(2) the debtor knew said representations were false at the time they were made;

(3) said representations were made with the intention and purpose of deceiving the creditor;

(4) the creditor relied on such representations; and

(5) the creditor sustained the alleged loss and damage as a result of the representations having been made.

*In re Sandler*, 143 B.R. 67, 70 (Bankr. E.D.Va.1992). In general, the objecting creditor bears the burden of proof, and must establish nondischargeability under § 523(a)(2)(A) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–90, 111 S.Ct. 654, 659–61, 112 L.Ed.2d 755 (1991).

■ The Court first notes that fraud and misrepresentation within the scope of § 523(a)(2)(A) may occur in ways other than in the commission of an overt act. "Silence

---

**1.** In relevant part, § 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2) (West 1995).

**2.** In relevant part, § 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4) (West 1995).

or concealment as to a material fact can constitute a false pretense or a false representation as surely as an overt act." *Community Hospital of Roanoke Valley, Inc. v. Musser (In re Musser),* 24 B.R. 913, 918 (W.D.Va.1982). *See also Central Bank v. Kramer,* 38 B.R. 80, 82 (Bankr.W.D.La.1984); *Peterson v. Bozzano,* 173 B.R. 990, 993 (Bankr.M.D.N.C.1994). "False pretenses" as used in § 523(a)(2)(A) means "implied misrepresentations or conduct intended to create and foster a false impression." *Bozzano,* 173 B.R. at 993.

Mrs. Shappy's position in this proceeding is that Scott was under a moral and legal duty to disclose to Mrs. Shappy the existence of the Broker Agreement and his agency relationship with Brooks. Impliedly and by extension, Mrs. Shappy asserts that since the Shappy real estate transaction fell within the technical scope of the Broker Agreement, Scott should have permitted Mrs. Shappy to reap the comparatively beneficial terms of that agreement, to wit, Scott should have required Brooks to pay the broker fee instead of the Shappys or Scott should have relinquished his fee in order to achieve the same result. Shappy also contends that Scott had a duty to disclose the existence of the Broker Agreement and the terms of that agreement since that information was material and relevant to the Shappy transaction and may have resulted in the Mrs. Shappy's refusal to complete the transaction or demand different terms. According to Mrs. Shappy, Scott's failure to disclose constituted self-dealing and duplicity. Thus, for the reasons stated above, Mrs. Shappy contends that Scott's failure to disclose the existence of the Broker Agreement constituted a misrepresentation under § 523(a)(2)(A).

■ The Court recognizes that Virginia real estate agents and brokers owe a duty of fair dealing and good faith to their clients. "[A] real estate broker occupies a fiduciary relation to his principal and so long as that relation continues is under a legal obligation, as well as a high moral duty, to give his

principal loyal service." *Owen v. Shelton,* 221 Va. 1051, 277 S.E.2d 189, 191 (1981) (quoting *Olson v. Brickles,* 203 Va. 447, 124 S.E.2d 895, 898 (1962)). As pointed out by Mrs. Shappy, this duty includes revealing all information that the agent's principal has a right to know. *See Jackson v. Pleasanton,* 101 Va. 282, 289, 43 S.E. 573 (1903).

> The general rule is well settled that a broker must act with entire good faith towards his principal, and he is bound to disclose to his principal all facts within his knowledge which are or may be material to the matter in which he is employed, or which might influence the principal in his action....

*Id.* (quoting *Veasey v. Carson,* 177 Mass. 117, 58 N.E. 177 (1900)); *see also Burruss v. Green Auction & Realty Company, Inc.,* 228 Va. 6, 319 S.E.2d 725, 727 (1984). In addition, Virginia Real Estate Board Regulations prohibit agents from "[a]cting for more than one party in a *transaction* without the written consent of all parties for whom the licensee acts."[3] (Plaintiff's Exhibit 9, p. 13, paragraph 6, Virginia Real Estate Board Regulations, § 3.5.6 (Effective July 15, 1987)) (emphasis supplied).

■ But even considering the foregoing, the Court nonetheless concludes that Scott did not engage in impermissible dual representation, nor did he abrogate his duty to Mrs. Shappy, nor did he commit a misrepresentation by omission. As a finding of fact, this Court determined that the Broker Agreement did not apply to the Shappy transaction. Scott represented only the Shappys in the Shappy transaction, and not Brooks. Accordingly, Scott did not engage in dual representation within that term's meaning in the Virginia Real Estate Board Regulations notwithstanding the fact that Scott contemporaneously represented Brooks in later, unrelated transactions in accordance with the Broker Agreement.

Similarly, while Scott failed to disclose the existence and terms of the Broker Agree-

**3.** The general prohibition against dual representation by agents and brokers without written consent contained within the Virginia Real Estate Board Regulations has now been codified with an effective date of October 15, 1995. *See* Va.Code Ann. §§ 54.1–2130 and 54.1–2139 (Michie 1994 with 1996 Supplement). But since the Shappy transaction took place in 1988, the Virginia Real Estate Board Regulations are controlling in this proceeding.

ment, Mrs. Shappy failed to adequately demonstrate the materiality and relevancy of the Broker Agreement and how full disclosure would have influenced her actions, particularly in light of her willingness to complete the transaction with full knowledge of the Broker Agreement and that she ultimately received full payment pursuant to the terms of the Purchase Contract. In hindsight, Mrs. Shappy contends that she would have acted differently with early disclosure, implying that she and her husband would have demanded different terms such as a waiver of Scott's fee, would have terminated her agency relationship with Scott, or would have refused to go forward with the transaction. But in reality, the Shappys did demand a reduction or waiver of Scott's fee, which he refused, and the Shappys did demand an increase in the sale price, which they did receive, and the Shappys did threaten to cancel the Purchase Contract, but did not.

The evidence demonstrates that ultimately, against the advice of their counsel and with full disclosure, the Shappys decided to complete the transaction. Mrs. Shappy now contends that Scott attempted to expurgate his fraud by promising to render personal services to Mrs. Shappy and her husband. Mrs. Shappy goes on to assert that it was this promise by Scott which induced her to complete the real estate transaction under the terms of the Purchase Contract as amended. Mrs. Shappy relies upon *West End Co. v. Claiborne*, 97 Va. 734, 752–53, 34 S.E. 900 (1900) for the proposition that her reliance on Scott's post-disclosure promise would prevent Scott from now asserting that Mrs. Shappy waived any claim of fraud by completing the transaction after full disclosure. Mrs. Shappy makes this claim notwithstanding her testimony that she believed at the time of the real estate closing that she was under no legal obligation to complete the sale transaction, and that she and her husband failed to pursue Scott for the services promised but not rendered.[4] But even accepting Mrs. Shappy's assertion, and even assuming that Mrs. Shappy's agreement to complete

the real estate transaction did not constitute waiver and ratification, for the reasons expressed herein, it is difficult for the Court to permit Mrs. Shappy to exercise with the benefit of hindsight the judgment that she had an opportunity to exercise at the time of the transaction.

The Court does not mean to imply that the Mrs. Shappy's argument is not compelling. On the contrary, at first glance, the Shappy transaction appears to represent a very inequitable result. At the core of Mrs. Shappy's complaint is the fact that she and her husband paid a $25,000 broker fee, while similar sellers represented by Scott paid no fee as a result of the Broker Agreement. But Mrs. Shappy mischaracterizes Scott's duty to disclose information material to her transaction as a duty to permit her to take advantage of a separate but contemporaneous agreement which would have benefitted Mrs. Shappy to the detriment of Scott. Moreover, for the reasons stated below, the Court concludes that the Broker Agreement was immaterial to the Shappy real estate transaction.

Mrs. Shappy presented no evidence that she did not receive a fair price for her real estate. The facts actually demonstrate that Brooks paid roughly the same price per acre for the Guthrie property under the Broker Agreement, including the commission, as he did for the Shappy Property. The Shappy Purchase Contract contemplated the sale of 50 acres for $261,000, or $5,220 per acre. Because the Shappy's paid the $25,000 fee from that amount, the Shappys netted $4,720 per acre after commission instead of the full $5,220 paid by Brooks.

The Guthrie purchase contract, executed two months after the Shappy Purchase Contract, contemplated the sale of a contiguous tract of land almost three times in size for $5,000 per acre exclusive of the commission. But Brooks paid an additional 5% in commission for the Guthrie property. In other words, Brooks actually paid the equivalent of $5,250 per acre for the Guthrie land, or $30

---

4. Presumably, if Mrs. Shappy believed that Scott's offer of personal services equaled her "loss" on the real estate transaction and that the services were offered in payment for that loss,

Mrs. Shappy could have pursued other remedies against Scott for his breach of the oral personal services contract. Apparently the Shappys chose not to do so.

more per acre than for the Shappys' land.[5] But because Brooks paid the commission, the Guthries received the same net amount per acre after commission, $5,000, as was reflected by the purchase price in their purchase contract. Thus, although Brooks paid an almost identical amount per acre, including commission, for the two properties, the Guthries received an additional $280 per acre, or roughly 5%, after commission.

The real difference between the Shappy and Guthrie transactions was not the price per acre paid by Brooks, but the allocation and amount of the commission. The Shappys' sale originally contemplated payment of the customary 10% commission to Scott, and after the price increase, Scott actually received a fee equal to 9.58% of the sale price. But the Guthrie sale, under the Broker Agreement, contemplated payment of a 5% commission instead of 10%. Since Brooks paid substantially the same price per acre for the land after payment of the commission fees, this 5% difference in commission paid to Scott actually accounted for the difference in after commission net proceeds to the Shappys and Guthrie. Disregarding which party actually wrote the check to Scott, Brooks paid roughly the same total amount per acre for both properties, but since Scott took 10% of that amount in the Shappy transaction and only 5% in the Guthrie transaction, the Guthries netted 5% more per acre after Scott was paid his commission by either the Shappys or Brooks.

The evidence presented by Shappy clearly demonstrates that as compared to Guthrie, the Shappys netted after commission proceeds roughly 5% less per acre in their transaction, and that the Shappys' comparative loss was Scott's gain since it was Scott who received the extra 5% commission. But viewed from another perspective, what actually occurred is that the Guthries netted 5% more than is customary owing to the existence of the Broker Agreement and Scott's willingness to accept 5% under that agreement instead of the customary 10%. For whatever reason, Scott executed the Broker Agreement, and by doing so, expressed a willingness to accept half of his normal commission on sales in which he represented Brooks under the Broker Agreement.[6] Scott's motivation in signing the Broker Agreement is mere speculation at this point. Perhaps Scott expected to complete sales under the Broker Agreement with less effort than is normal, or in less time, or in greater than usual numbers, and was therefore willing to accept a lower commission on individual sales. But what is clear is that certain sellers, like the Guthries, apparently realized a benefit based solely upon Scott's willingness to enter into the Broker Agreement. By the same token, sellers like the Shappys who did not fall within the Broker Agreement paid the full 10% customary commission, and did not therefore receive such preferential treatment. By analogy, the Shappys' position is similar to that of a buyer who arrives at a store and purchases an item the day before that item goes on sale. It is up to the store to determine whether to extend special treatment to the unfortunate customer.

The Court concludes without difficulty that Scott was not required to extend to the Shappys the favorable treatment embodied in the Broker Agreement, and the resulting loss to Scott. The Broker Agreement represented a contract between two parties, Scott and Brooks, and those parties had a right to limit the scope of their agreement. The Court is simply not aware of any statutes, regulations or case law which would require Scott to include one client's transac-

---

5. The Court has no evidence other than the contract prices regarding the actual value of these parcels of property. The Court can therefore only speculate that the contiguous parcels were substantially equal in value on a per acre basis, although the relative size of the Guthrie property may well explain the $30 difference in value offered by Brooks.

6. In point of fact, the existence of the Broker Agreement and its commission of 5% did not limit Scott to a 5% commission. Scott could have negotiated additional compensation from the sellers of property outside of the Broker Agreement so long as Scott engaged in full disclosure. While it appears from the evidence presented in this proceeding that Scott did not seek or obtain this additional compensation from Broker Agreement sellers, the Court is not aware of any limitation on his doing so.

tion within a separately negotiated, arms-length agreement simply because of the congruity of the parties involved. Both Scott and Brooks testified that the Shappy transaction, while technically falling within the terms of the Broker Agreement, had been intentionally excluded from treatment under that agreement prior to execution of the Broker Agreement because the Shappy transaction was "already in the works." While Scott benefitted from the Shappy's exclusion, Mrs. Shappy was not injured except to the extent that she failed to receive the unusual treatment afforded those parties who did fall within the Broker Agreement.

Mrs. Shappy presented no evidence that she was in a position to demand favorable or special treatment from Scott or any other agent, and Mrs. Shappy presented no evidence that she could have received a better price or the 5% commission rate had she employed another agent. The comparative price paid by Brooks for the Guthries' property tends to demonstrate just the opposite; that the Shappys received a fair price from their purchaser.

 In other words, Shappy did not demonstrate that Scott failed to adequately represent her in good faith and to the best of his ability except to the extent that Scott refused to include her in an agreement with a third party after both Scott and the third party affirmatively decided to exclude the Shappys. Moreover, because the Broker Agreement applied to unrelated, later transactions and Scott was under no obligation to include Mrs. Shappy's transaction within those covered by the Broker Agreement, the Court declines to find that Scott had a duty to disclose the existence of an Broker Agreement.[7] The Court recognizes that this result is not intuitively obvious and appears inconsistent with the normal agent-principal relationship. In

effect, Scott was faced with a decision—should he accord the Shappys treatment under the Broker Agreement at a direct loss to himself, or should he treat the Shappys the same way in which he apparently treated other principals with whom he had dealings prior to the execution of the Broker Agreement. Scott chose not to forgo his current compensation, and as a result, has been involved in litigation for eight years.

The Court has great empathy for Mrs. Shappy. Her neighbor executed a sale agreement just after she did and netted 5% more per acre at the expense of Scott. And two years later, the same land was sold for more than six times the price that she received. But the Court cannot conclude that Scott committed a fraudulent misrepresentation within the scope of § 523(a)(2)(A). Since Mrs. Shappy was clearly excluded from taking part in the Broker Agreement, the existence of that agreement was not relevant to the terms of her sale and Scott's representation of the Shappys. Moreover, even if the Court concluded otherwise, since Mrs. Shappy later completed the transaction with the benefit of full disclosure, the Court similarly refuses to find that Scott's failure to disclose the existence of the Broker Agreement caused Mrs. Shappy to suffer any loss. Likewise, Mrs. Shappy failed to demonstrate by a preponderance of the evidence that Scott intended to deceive her. Scott testified that he believed, and continues to believe, that he was under no duty to disclose the existence of the Broker Agreement, and Shappy failed to demonstrate otherwise. Lastly, Mrs. Shappy failed to demonstrate any damages caused by Scott's failure to disclose. Whether Mrs. Shappy could have obtained a better price or a lower commission by employing a different agent remains pure conjecture.[8] For all of these reasons,

7. Mrs. Shappy provided no direct evidence that agents or brokers in similar circumstances would be required to disclose information about unrelated transactions, or would be required to extend preferential treatment embodied in a Buyer–Agent Contract like the Broker Agreement to all clients of an agent who might possibly fall within the provisions of such a document. An expert witness testifying on behalf of Mrs. Shappy did state that in her agency, she would have required Scott to make disclosure. But the ex-

pert witness could not identify specific requirements to do so, nor could she state with certainty that the accepted practice in the community would have required such a disclosure.

8. Mrs. Shappy asserted that the proper measure of damages should be the amount of the commission or $25,000. Mrs. Shappy based this contention on the fact that Virginia Courts routinely require real estate brokers or agents to forfeit their commission when they breach their

the Court declines to determine that Scott's actions created a debt nondischargeable under § 523(a)(2)(A).

 The Court now turns to Mrs. Shappy's § 523(a)(4) nondischargeability claim. As was the case with a § 523(a)(2)(A) claim, the objecting creditor bears the burden of proof, and must establish nondischargeability under § 523(a)(4) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–90, 111 S.Ct. 654, 659–61, 112 L.Ed.2d 755 (1991). In order to prevail on her § 523(a)(4) allegation, Mrs. Shappy must demonstrate the existence of the necessary fiduciary relationship between the parties, and the existence of a fraud or defalcation.[9] *See, e.g., Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Myers*, 52 B.R. 901 (Bankr. E.D.Va.1985). This Court has previously held that § 523(a)(4) requires the existence of more than an implied trust or agency relationship. *Id.* at 904. Section 523(a)(4) requires instead a technical or express trust, or a trust created by statute. *See, e.g., Id.; N.P. Deoudes, Inc. v. Snyder (In re Snyder)*, 184 B.R. 473, 475 (D.Md.1995). Moreover, the Court must construe the term "fiduciary" very narrowly. *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1341 (5th Cir.1980).

This Court has previously found a fiduciary relationship between a real estate broker and purchaser by relying upon the Virginia Real Estate Board Regulations. *Bodie v. Britt (In re Britt)*, 156 B.R. 511, 518 (Bankr. E.D.Va.1993) (construing regulations governing the disbursal of escrow funds as creating an express trust). Mrs. Shappy relies upon this Court's decision in *In re Barwick* and urges the Court to adopt a viewpoint that the relationship between herself and Scott gave rise to a technical trust relationship. 24 B.R. 703 (Bankr.E.D.Va.1982) (finding that a power of attorney between a financial advisor and his client created a fiduciary relationship under § 523(a)(4)). Mrs. Shappy urges that she entrusted Scott with the sale of her property, which necessarily included entrusting Scott with her expectation of profits, and that this relationship established the necessary technical trust.

 While the Court does not rule out the potential existence of a § 523(a)(4) fiduciary relationship between a real estate agent and a seller, the Court nonetheless declines to find such a relationship for the purposes requested in this matter. Neither state statutes nor regulations, nor the actions of the parties themselves, demonstrate a sufficient basis to form an express or technical fiduciary relationship of the type required by § 523(a)(4) with respect to Mrs. Shappy's allegations. Had Mrs. Shappy asserted that Scott had misapplied an earnest money deposit or escrow funds entrusted to him— activities controlled by the Virginia Real Estate Board Regulations—a sufficient fiduciary relationship would have existed. *See* (Plaintiff's Exhibit 9, p. 13, paragraph 6, Virginia Real Estate Board Regulations, § 3.4.E. (effective July 15, 1987)). Unlike the situation in *Barwick*, Mrs. Shappy did

---

duty to a principal. *See, e.g., Owen*, 277 S.E.2d at 192. But damages calculated in this manner are more properly described as punitive and not as a true measure of the actual damages incurred by the wronged principal. "The purpose of the [forfeiture of commission] rule is more prophylactic than remedial; it is applied, not to compensate the principal for an injury, but rather to discipline the fiduciary in the conduct of the office entrusted to him." *Id.* Moreover, the record is clear that Scott only received a portion of this commission, with the remainder being paid to Brittingham and to Hallberg who are not parties to this proceeding. Mrs. Shappy failed to provide any reason for this Court to arbitrarily accept the $25,000 commission figure as an accurate measure of her damages, let alone her request for $250,000 in punitive damages, and the Court declines to do so. At the same time, Mrs. Shappy also failed to provide any evidence

of any actual damages incurred by her as a result of Scott's alleged misrepresentations except to the extent that Mrs. Shappy was not permitted to participate in the Broker Agreement and reduce or eliminate the commission she paid. Even accepting this as a measure of damages, the Court is unable to arrive at appropriate damages without further evidence since the price paid by Brooks if the sale occurred within the Broker Agreement almost certainly would have been different than the $261,000 paid by him outside of the Broker Agreement.

9. Although premised generally upon § 523(a)(4), Shappy's complaint and subsequent filings fail to allege any embezzlement or larceny. Accordingly, the Court declines to consider these portions of § 523(a)(4).

not provide Scott with a general power to take actions and transfer assets without her oversight or approval. *Barwick,* 24 B.R. at 706.

But assuming for the moment that the Court did find that a sufficient fiduciary relationship existed between Scott and Mrs. Shappy, the Court would nonetheless deny Mrs. Shappy's § 523(a)(4) nondischargeability claim based upon her failure to identify Scott's defalcation or fraud. Both in argument and in her trial brief, Mrs. Shappy relies heavily upon *LSP Investment Partnership v. Bennett (In re Bennett),* for the proposition that a willful neglect of duty by a fiduciary may constitute a sufficient defalcation under § 523(a)(4). 989 F.2d 779, 790 (5th Cir.1993), *cert. denied* 510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993). Mrs. Shappy contends that Scott diverted profits from the Shappy real estate transaction to himself at the expense of Mrs. Shappy, and in doing so, willfully neglected his duty to Mrs. Shappy.

This Court has held in the past that defalcation, the failure to account for money or property that has been entrusted to one, does not require intentional misconduct. *See, e.g., Landvest Associates v. Owens (In re Owens),* 54 B.R. 162, 165 (Bankr.D.S.C. 1984). Defalcation under § 523(a)(4) may consist of negligence and the "slightest misconduct." *Id.; see also Hodnett v. Loevner (In re Loevner),* 167 B.R. 824, 827 (Bankr. E.D.Va.1994).

For the reasons stated above in the Court's § 523(a)(2)(A) analysis, Mrs. Shappy failed to demonstrate that the $25,000 commission contemplated by the Shappy Purchase Contract constituted anything more than the customary commission on the fair market price of the Shappys' real estate. Mrs. Shappy failed to demonstrate that Scott's duty to her as his principal included disclosing the existence of the Broker Agreement, or applying the preferential terms of that agreement to her transaction.

Mrs. Shappy's reliance on *Bennett* is misplaced as that case is easily distinguished. In *Bennett,* the debtor was a managing general partner who willfully and improperly paid himself a $1 million bonus without meeting the preconditions for doing so and to the detriment of limited partners who had no knowledge or control over the debtors actions as managing general partner. *Bennett,* 989 F.2d at 782. The *Bennett* Court found that the debtor incurred debts through willful neglect of his duties, and determined that those debts were nondischargeable under § 523(a)(4). *Id.* at 790. Unlike the *Bennett* creditors, Mrs. Shappy and her husband played a direct role in the negotiation and consummation of their real estate sale, and even had full disclosure prior to settlement. Moreover, Mrs. Shappy failed to demonstrate that Scott caused her any damages except to the extent that he denied them the preferential terms of the Broker Agreement which this Court has determined was his right.

For the reasons cited above, Mrs. Shappy's § 523(a)(4) nondischargeability claim should be denied.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.